# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2616

_____

| | | |
|---|---|---|
| Lavon Phillips, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Mary K. Grendahl; Econ Control, Inc., | * | District of Minnesota. |
| doing business as Sherlock Information | * | |
| System; McDowell Investigations, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: March 15, 2002

Filed: December 5, 2002 (Corrected 12/19/02)

_____

Before HANSEN, Chief Judge, JOHN R. GIBSON, Circuit Judge, and GOLDBERG,[1] Judge.

_____

JOHN R. GIBSON, Circuit Judge.

Lavon Phillips appeals from the district court's entry of summary judgment against him in his Fair Credit Reporting Act and Minnesota tort law claims against his prospective mother-in-law, Mary K. Grendahl; a detective agency, McDowell

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

Agency, Inc.;[2] and Econ Control, Inc., doing business as Sherlock Information System. The district court held that there was no evidence that Grendahl or the other defendants had obtained a credit report on Phillips by false pretenses. The court rejected Phillips's contention that he had pleaded a claim for wrongful disclosure of a consumer report and stated that such a claim would not be viable anyway because the document at issue in this case was not a "consumer report" covered by the Fair Credit Reporting Act. Finally, the court held that Phillips's invasion of privacy claim failed because there was no publication of a matter that would be "highly offensive to a reasonable person." Phillips challenges each of the district court's conclusions. We affirm in part, reverse in part, and remand for trial.

I.

We review a grant of summary judgment de novo. Darby v. Bratch, 287 F.3d 673, 678 (8th Cir. 2002). We will affirm if, viewing the record in the light most favorable to Phillips, there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

Mary Grendahl's daughter Sarah became engaged to marry Phillips and moved in with him. Mary Grendahl became suspicious that Phillips was not telling the truth about his past, particularly about whether he was an attorney and whether he had done legal work in Washington, D.C. She also was confused about who his ex-wives and girlfriends were and where they lived. She did some preliminary investigation herself, but she felt that she was hampered by not being able to use a computer, so she contacted Kevin Fitzgerald, a family friend who worked for McDowell, a private investigation agency. She asked Fitzgerald to do a "background check" on Phillips,

---

[2]Phillips's complaint identifies this defendant as "McDowell Investigations," but the defendant refers to itself as "McDowell Agency, Inc."

2

and she also gave him the name of the woman Phillips had lived with before Sarah Grendahl.

Fitzgerald began his search by obtaining Phillips's social security number from a computer database. He also searched public records in Minnesota and Alabama, where Phillips had lived earlier. He discovered one suit against Phillips for delinquent child support in Alabama, a suit to establish child support for two children in Minnesota, and one misdemeanor conviction for writing dishonored checks.

Fitzgerald then supplied the social security information to Econ Control and asked for "Finder's Reports" on Phillips and the former girlfriend.[3] Fitzgerald testified that he believed that Finder's Reports were not consumer reports and therefore that they were not subject to the Fair Credit Reporting Act.

Econ Control was in the business of furnishing credit reports, Finder's Reports, and credit scoring for credit grantors and for private investigators. William Porter, president of Econ Control, testified in his deposition in this case that he had been advised by a representative of Computer Science Corporation that one of their products, called a "Finder's Report," could be obtained without authorization of the person who was the subject of the report because the Finder's Report contained no information on credit history or creditworthiness. Porter testified that a Credit Report, on the other hand, requires authorization from the subject.[4] Fitzgerald learned of Econ Control from a presentation by Porter at a meeting of the Minnesota Private Investigators Association. Porter told the investigators at the seminar that no

_____

[3]The former girlfriend is not a party to this case. Phillips has not contended that he has standing to assert her rights. Therefore, no issues about possible violation of her rights are before us.

[4]In fact, it is not always necessary to have the subject's authorization before obtaining a consumer report. See generally 15 U.S.C. § 1681b(a) (2000).

3

authorization was necessary to obtain a Finder's Report and that it would be useful in trying to locate people. Porter handed out sample Finder's Reports which showed information on a fictional consumer, including address, aliases, birthdate, employer addresses, and the identity of firms with which the consumer had credit accounts and firms that had made inquiries about the consumer.

Robert McDowell, on behalf of McDowell Agency, had signed an Econ Control registration agreement, titled "Agreement for Consumer Credit Services." One clause of the registration agreement stated:

> 3. I certify that I will order consumer reports, as defined by the Fair Credit Reporting Act, only when they are intended to be used as a factor in establishing a consumer's eligibility for new or continued credit, collections of an account, insurance, licensing, employment purposes, or otherwise in connection with a legitimate business transaction involving the consumer. Such reports will be used for no other purpose. Each time I request a report I intend to use for employment purposes, I will specifically identify it to [Econ Control] at the time I request the report.

Kevin Fitzgerald was listed in the registration agreement as an individual who was authorized "to request credit worthiness scores" for McDowell. To obtain the Finder's Report on Phillips, Fitzgerald simply faxed Econ Control a request listing Phillips's name, date of birth, address and social security number. Econ Control did not ask why McDowell wanted the report, and McDowell did not tell. Econ Control obtained a report from Computer Science Corporation on Phillips and passed it onto McDowell.

Fitzgerald met with Mary Grendahl and gave her the results of his investigation, including the Finder's Report. Someone wrote on the copy of the Finder's Report on Phillips: "Credit inquiry report and Employment Trace."

4

Phillips learned that Sarah Grendahl's family had investigated his past when Laura Grendahl, Sarah's sister, telephoned Sarah about nine months after the investigation. Phillips's complaint alleges that he also spoke to Laura and that she asked him in this telephone conversation whether he had ever written a bad check and how much back child support he owed. After further unpleasantness between Sarah and her family, Mary Grendahl telephoned and left the following voicemail for Sarah:

> Sarah this is mom. I didn't directly do a credit report. I hired a PI and they have every right to do that.

The record contains evidence that each defendant has some familiarity with the fact that the law limits access to consumer credit reports. Mary Grendahl owns the Park Apartments in Minneapolis. The apartment business office obtains credit information on prospective tenants as part of its business. The office always obtains the tenant's written permission to obtain a credit report, "[b]ecause it's necessary to have their signature to get a credit report," according to Mary Grendahl. Porter, the president of Econ Control, testified that he had read the section of the Fair Credit Reporting Act governing resale of credit information. Fitzgerald testified that sometime during his employment with McDowell, he had heard of the Fair Credit Reporting Act.

Phillips brought this suit against Mary Grendahl, McDowell Agency, and Econ Control, alleging, "Defendants willfully and maliciously obtained Plaintiff's credit report for impermissible and illegal purposes in violation of the Fair Credit Reporting Act § 1681q." Phillips also alleged that the defendants had invaded his privacy by disclosing "private and confidential facts to third parties," which was "highly offensive" to Phillips and of no legitimate concern to the public. He also alleged that the defendants had unreasonably intruded upon his seclusion. Phillips appended to his complaint a "Credit History" on himself, complete with lists of charged-off credit card accounts, delinquent child support obligation, government tax lien, and three

5

judgments against him, and also showing that Sherlock Information (the trade name of Econ Control) had requested a credit history on him.

Phillips and the defendants filed cross motions for summary judgment. The district court held that there was no evidence that any defendant had misrepresented the purpose of the inquiry, which was "a parent's attempt to learn background information about a future son-in-law," and that Phillips had therefore failed to produce evidence that anyone obtained a consumer report on him by false pretenses. Nor, the district court stated, was there evidence that the defendants' conduct was knowing or willful. Next, the court held that Phillips's complaint could not be read to state a claim for violating 15 U.S.C. § 1681b(f), which prohibits using or obtaining consumer reports except for purposes authorized by section 1681b. Additionally, the court stated that even if the complaint could be read to state a claim under section 1681b, it was doubtful whether the Finder's Report could be characterized as a "consumer report" because it was not used in a credit or employment decision and it had no information bearing on Phillips's creditworthiness. Finally, the court held that the facts did not satisfy the elements of an Invasion of Privacy claim:

> The request of a parent to obtain information on a future son-in-law from an investigative service may not be a genteel approach, but given concerns and lack of available alternative sources from which to garner information, the request does not become "highly offensive." Here, as a matter of law, the conduct and publicity alleged by Phillips is not "highly offensive to a reasonable person."

The court entered summary judgment for the defendants.[5]

_____

[5]Econ Control contends that the district court failed to dispose of its cross-claim against McDowell and that the judgment is therefore not final and appealable. Our review of the record indicates that the district court expressly dismissed the case "in its entirety." It follows that the court implicitly dismissed Econ Control's indemnification claim with the rest of the lawsuit. See Spangle v. Min Tah Elec. Co.,

II.

The Fair Credit Reporting Act, 15 U.S.C. §§ 1681b-1681u (2000), prohibits the disclosure of consumer credit reports by consumer credit reporting agencies, except in response to the following kinds of requests: (1) court order or subpoena, § 1681b(a)(1); (2) request by governmental agencies involved in setting or enforcing child support awards, § 1681b(a)(4) and (5); (3) request authorized in writing by the consumer about whom the report is made, § 1681b(a)(2); or (4) request by a person whom the reporting agency has reason to believe intends to use the consumer report for one of a number of specific, permissible business reasons, § 1681b(a)(3).

Phillips pursues two theories under the Fair Credit Reporting Act--that the defendants obtained a consumer report on him by use of false pretenses, § 1681q, and that they obtained a consumer report for an impermissible purpose, § 1681b(f). The district court concluded that these two theories were distinct causes of action and held that Phillips had failed to plead violation of section 1681b(f), obtaining a consumer report for an impermissible purpose, because his complaint only mentioned section 1681q, obtaining a consumer report under false pretenses. However, as discussed below, we conclude that these two theories coincide. Although at one time it made sense to refer to a civil claim for obtaining a consumer report without a permissible purpose as arising under section 1681q, amendments to the statute in 1996 open a more straightforward path to civil liability for the same conduct.

15 U.S.C. § 1681q, which prohibits obtaining consumer information willfully and by use of false pretenses, is on its face a criminal statute. The reasons for its use as a basis for civil liability are historical, and it is now largely redundant as a basis

866 F.2d 1002, 1003 (8th Cir. 1989); In re Anderburg-Lund Printing Co., 109 F.3d 1343, 1347 (8th Cir. 1997).

7

for civil liability. Originally the Fair Credit Reporting Act provided two distinct civil causes of action for failure to comply with requirements of the Act, one cause for willful violations and one for negligent violations. 15 U.S.C. §§ 1681n (1994) (willful noncompliance) and 1681o (1994) (negligent noncompliance). In addition to the civil liability provisions, section 1681q made it a criminal offense to willfully request information on a consumer from a consumer reporting agency under false pretenses. 15 U.S.C. § 1681q (1994).

After the Fair Credit Reporting Act was enacted in 1970, courts noticed what appeared to be a loophole. The original sections 1681n and 1681o only created civil liability for failure to comply with the Act. The original section 1681b, which generally stated the circumstances under which consumer reporting agencies could provide reports, did not impose a duty on users of reports to refrain from requesting reports without a proper purpose.

> § 1681b only limits the dissemination of 'consumer reports' by 'consumer reporting agencies.' It does not, by its plain terms, place any duty upon persons to refrain from requesting consumer reports from individuals for purposes not authorized by the FCRA.

Ippolito v. WNS, Inc., 864 F.2d 440, 448 n.8 (7th Cir. 1988); see 15 U.S.C. § 1681b (1994). Therefore, civil actions against users of information, rather than consumer reporting agencies, could not be premised on violation of the original section 1681b. See, e.g., Heath v. Credit Bureau, 618 F.2d 693, 697 (10th Cir. 1980) (no liability for requesting a report because Act did not require defendant to refrain from requesting report, even without proper purpose). Courts avoided this loophole by reasoning that since section 1681q created criminal liability for requesting "information on a consumer" using false pretenses, this prohibition was a "requirement" of the Act, and therefore provided the substantive basis for civil liability. See Hansen v. Morgan, 582 F.2d 1214, 1219 (9th Cir. 1978); Kennedy v. Border City S&L Ass'n, 747 F.2d 367, 369 (6th Cir. 1984); Zamora v. Valley Fed. S&L Ass'n, 811 F.2d 1368, 1370

8

(10th Cir. 1987); <u>Yohay v. City of Alexandria Employees Credit Union, Inc.</u>, 827 F.2d 967, 971-72 (4th Cir. 1987); <u>Northrop v. Hoffman of Simsbury, Inc.</u>, 134 F.3d 41, 47 (2d Cir. 1997).  "False pretenses" was interpreted to mean failure to disclose the lack of a permissible purpose.  <u>See</u> <u>Northrop</u>, 134 F.3d at 46 n.6.

The Fair Credit Reporting Act was amended in 1996 to add to section 1681b a provision that forbids using or obtaining a consumer report unless the report was obtained for a permitted purpose.  15 U.S.C. § 1681b(f) (2000).[6]  Moreover, section 1681n received new language imposing civil liability of a minimum of $1000 against natural persons for "obtaining a consumer report under false pretenses or knowingly without a permissible purpose." 15 U.S.C. § 1681n (a)(1)(B) (2000).  Thus, the civil liability provisions now explicitly cover the act of obtaining a consumer report without a permissible  purpose, which formerly was included only by incorporating the criminal liability statute.  Accordingly, Phillips's reliance in his complaint on section 1681q for civil liability is anachronistic and unnecessary.[7]

---

[6]15 U.S.C. § 1681b(f) (2000) provides:

A person shall not use or obtain a consumer report for any purpose unless–
(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
(2)  the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

Phillips has not alleged or briefed the adequacy of certification under 15 U.S.C. § 1681e.  Section 1681b(f) is violated by lack of either a permissible purpose or certification of the report, so Phillips's cause does not depend on inadequacy of certification.

[7]Section 1681q is arguably still broader than section 1681n in that section 1681q forbids requesting "information on a consumer from a consumer reporting agency," whereas 1681n applies only to request of a "consumer report."  <u>See</u> <u>Ippolito</u>,

Phillips's failure to identify the correct statutory section does not limit us in construction of his complaint, so long as the complaint pleads facts that state a cause of action under the correct section. Northrop, 134 F.3d at 45-46 ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.").

We therefore will test Phillips's claim against each of the three defendants under sections 1681n(a) and 1681o, for allegations of willful and negligent misuse or acquisition of a consumer report. Under both sections, Phillips must prove that there was a consumer report, that defendants used or obtained it, and that they did so without a permissible statutory purpose. He must also prove that the defendants acted with the specified level of culpability, which is willfulness under section 1681n and negligence under section 1681o.

Either of these theories is adequately, though not skillfully, pleaded in Phillips's Amended Complaint, which states that the defendants "willfully and maliciously obtained [Phillips's] credit report for an impermissible and illegal purpose." Although the complaint does not literally plead that defendants lacked a permissible purpose, see § 1681n(a)(1)(B)(obtaining a consumer report without a permissible purpose), for purposes of notice pleading, lack of permissible purpose is implicit in the allegation that they did have an impermissible purpose.

---

864 F.2d at 448 n.8. But see Kennedy, 747 F.2d at 369 ("Sections 1681n and 1681q by their terms are not limited to transactions involving credit reports as are many other provisions of the Act."). However, Phillips does not rely on this aspect of section 1681q and in fact contends that the Finder's Report was a consumer report.

## III.

The defendants argue that Phillips has not adduced evidence of each of the elements of his Fair Credit Reporting Act claim and therefore cannot withstand their summary judgment motion.

## A.

The first step in establishing liability under section 1681n(a) or section 1681o for obtaining a consumer report without a permissible purpose is to show that the document at issue was a "consumer report." The statutory definition is complex. Section 1681a(d) defines a consumer report as (1) any written, oral, or other communication of information (2) by a consumer reporting agency (3) bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living (4) which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purposes authorized under section 1681b. Section 1681b in turn lists five major purposes, two of which have many subparts.

In this case, there is no dispute that the Finder's Report was (1) a written communication (2) by a consumer reporting agency, Computer Science Corporation. The two issues in dispute pertaining to whether the Finder's Report is a consumer report are (3) whether it contained the sort of personal information that would bring it within the definition and (4) whether anyone "expected" the Finder's Report or the information in it to be used for one of the purposes listed in the definition or "collected" the information in it for that purpose.

(1)

A consumer report must contain information "bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d). The District of Columbia Circuit observed that this element "does not seem very demanding," Trans Union Corp. v. FTC, 81 F.3d 228, 231 (D.C. Cir. 1996) (Trans Union I), for "almost any information about consumers arguably bears on their personal characteristics or mode of living." Trans Union Corp. v. FTC, 245 F.3d 809, 813 (D.C. Cir. 2001) (Trans Union II), cert. denied, 122 S. Ct. 2386 (2002). The Finder's Report listed "Trade line Information," consisting of the names of several creditors with whom Phillips had credit accounts and the existence of a child support obligation, with dates for "last activity," but no other details such as amount of obligation or payment history. The District of Columbia Circuit has held that information showing the existence of trade lines, even without any details of credit history, satisfies the minimal requirement that information "bear" on the subject's "mode of living," since it shows that he has bothered to establish credit accounts. Trans Union I, 81 F.3d at 231. The Finder's Report also lists Phillips's former employers, which also would bear on his mode of living by showing that he has been employed. We conclude that the Finder's Report contains the kind of personal information required by the definition of consumer report.

(2)

The second question, whether the putative consumer report or the information in it was "used or expected to be used" or "collected for" one of the listed purposes, such as use in a credit or employment decision, § 1681a(d), is more difficult. Three statutory ambiguities in this clause could affect what communications are covered by the clause: the statutory language does not specify who must do the using, collecting or expecting; whether those verbs describe a specific or habitual action; or whether

12

those actions must be done with regard to "information" or with regard to the consumer report itself. McDowell Agency essentially argues the clause requires that either the credit agency prepared the Finder's Report in the expectation that it would be used for a statutory purpose or that the requestors did so use it. McDowell Agency contends that the Finder's Report was too incomplete to enable anyone to base a credit decision on it, so neither the requestors nor the credit agency could have expected the report to be used in a credit decision. Phillips, on the other hand, focuses on the information in the report, rather than the report itself. He argues that some of the information was of a type habitually "used" by people within the credit industry for the purposes covered by the statute and that therefore no showing about anyone's actual intent with regard to the Finder's Report was necessary to make it a consumer report.

We need not choose among the competing interpretations of the clause urged by the parties, because we conclude that the Finder's Report fell within the "used, expected to be used, or collected" clause even under the interpretation urged by McDowell Agency. The record demonstrates that the Finder's Report, not just the information in it, was actually intended by the credit reporting agency that prepared it to be used for a statutory purpose. The sample Finder's Report supplied by Econ Control to McDowell Agency states: "FINDERS delivers skip-locate power in a cost-effective, easy-to-use format. This remarkable product was designed by and for collections professionals who need timely debt-recovery support at an economical price." In addition to the statutory purposes listed in section 1681a(d), such as extension of credit or offer of employment, the statute incorporates by reference the statutory purposes listed in 15 U.S.C. § 1681b. One purpose in that list is use "in connection with a credit transaction . . . involving . . . collection of an account of, the consumer,"–in other words, debt collection. § 1681b(a)(3)(A); Duncan v. Handmaker, 149 F.3d 424, 427-28 (6th Cir. 1998). It therefore appears that the Finder's Report was prepared by Computer Science Corporation with the expectation that it would be used for a statutory purpose. That being the case, the Finder's Report

13

is a consumer report even though the requestor never used or intended to use it for a statutory purpose. Bakker v. McKinnon, 152 F.3d 1007, 1012 (8th Cir. 1998) ("Under the FCRA whether a credit report is a consumer report does not depend solely upon the ultimate use to which the information contained therein is put, but instead, it is governed by the purpose for which the information was originally collected in whole or in part by the consumer reporting agency."); Yang v. Gov't Employees Ins.Co., 146 F.3d 1320, 1325 (11th Cir. 1998); St. Paul Guardian Ins. Co. v. Johnson, 884 F.2d 881, 885 (5th Cir. 1989). But see Matthews v. Worthen Bank & Trust Co., 741 F.2d 217, 219 (8th Cir. 1984) (per curiam) (credit report on individual used only for commercial transaction was "exempt from the FCRA" because not used for statutory purpose); Houghton v. New Jersey Mfrs. Ins. Co., 795 F.2d 1144, 1148-49 (3d Cir. 1986).

B.

We next determine whether each of the defendants "obtained or used" the consumer report. There is no dispute that McDowell Agency and Econ Control obtained a consumer report, for each of them requested a Finder's Report.

Mary Grendahl, on the other hand, testified that she did not request the release of any credit information on Phillips. Mere passive receipt of the report would not be enough to satisfy the statutory element that she "use or obtain" a consumer report. See 15 U.S.C. § 1681b(f)("use or obtain") and § 1681n(a)(1)(B) ("obtaining"). Cf. Ippolito v. WNS, Inc., 864 F.2d 440, 453-54 (7th Cir. 1988) (under former version of statute, if requestor seeking information for non-consumer purpose does not know or have reason to know that consumer credit agency gathered information for consumer purpose, thus making it a consumer report, request does not result in liability). However, Phillips argues that the phone machine message Grendahl left for Sarah is evidence that she asked Fitzgerald to obtain credit information: "Sarah,

14

this is mom. I didn't directly do a credit report. I hired a PI and they have every right to do that." This evidence is ambiguous. On the one hand, it could mean that Grendahl hired a private investigator because she thought he was entitled to do a credit report. On the other hand, it could mean that she simply hired a private investigator who ordered a credit report on his own initiative, which she now understood he was entitled to do. Because this case was disposed of on summary judgment, we must resolve any ambiguities in the evidence in favor of Phillips. See Spencer v. Stuart Hall Co., 173 F.3d 1124, 1127 (8th Cir. 1999) (reviewing denial of JAML, we construe any ambiguities in favor of the verdict). In this procedural posture, the ambiguous telephone message is sufficient to create a genuine issue of fact as to whether Mary Grendahl asked Fitzgerald to obtain a consumer report on Phillips.

Phillips also argues that Laura Grendahl's comments about him being delinquent in child support and having written bad checks is evidence that Mary Grendahl used the Finder's Report. To the contrary, the Finder's Report does not reveal that Phillips was behind in child support or had written bad checks, so Laura could not have learned these facts from the Finder's Report.[8] Therefore, Laura Grendahl's comments do not help to prove Mary Grendahl used the Finder's Report.

C.

The next inquiry is whether any of the defendants had a permissible statutory purpose for obtaining the consumer report. The only purpose for obtaining the report

---

[8]Laura Grendahl testified that she learned Phillips was behind in child support when a sheriff came to the Park Apartments searching for Phillips. Laura Grendahl denied making the comment about the bad checks. Fitzgerald testified that he discovered both the child support arrears and the bad check charges through his search of public records.

15

was to obtain information on Mary Grendahl's prospective son-in-law. Investigating a person because he wants to marry one's daughter is not a statutory consumer purpose under section 1681b(a). Even if getting married can be characterized as a consumer transaction under section 1681b(a)(3), it was not Mary Grendahl, but her daughter, whom Phillips was engaged to marry. He had no business transaction pending with Mary Grendahl. There was no permissible purpose for obtaining or using a consumer report.

## D.

The element of culpability varies according to whether the cause arises under section 1681n generally, section 1681n(a), or section 1681o.

## (1)

Section 1681n(a) provides civil liability for willful noncompliance with any requirement of the Fair Credit Reporting Act.

We must initially determine first, what state of mind amounts to willfulness and second, whether the defendant must willfully request the report or willfully violate a requirement of the Fair Credit Reporting Act. In Bakker v. McKinnon, 152 F.3d 1007 (8th Cir. 1998), we quoted from the Third Circuit: "To show willful noncompliance with the FCRA, [the plaintiff] must show that [the defendant] 'knowingly and intentionally committed an act in conscious disregard for the rights of others,' but need not show 'malice or evil motive.'" Id. at 1013 (quoting Cushman v. Trans Union Corp., 115 F.3d 220, 226 (3d Cir. 1997)). This language originated in the Fifth Circuit case of Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th Cir. 1986). Under this formulation the defendant must commit the act that violates the Fair Credit Reporting Act with knowledge that he is committing the act and with intent to do so,

and he must also be conscious that his act impinges on the rights of others.  See, e.g., Dalton v. Capital Assoc. Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001) ("'knowingly and intentionally committed an action in conscious disregard for the rights'" of consumer); Duncan v. Handmaker, 149 F.3d 424, 429 (6th Cir. 1998) (stating that liability under § 1681n requires that defendant act "willfully and purposefully with motivation to injure" and holding that belief that request was permissible would negate liability); Casella v. Equifax Credit Info Sys., 56 F.3d 469, 476 (2d Cir. 1995) (no willfulness without "conscious disregard" or "deliberate and purposeful actions"); Zamora v. Valley Fed'l S&L Ass'n, 811 F.2d 1368, 1370 (10th Cir. 1987) (upholding liability under § 1681n where there was "ample evidence in the record from which the jury could conclude that defendant knew [the request it made] was not permissible"); Yohay v. City of Alexandria Employees Credit Union, Inc., 827 F.2d 967, 972 (4th Cir. 1987) (upholding liability for punitive damages where "there is considerable evidence in the record to support the jury's implicit finding that the Credit Union consciously ignored the rights of Yohay"); Stevenson v. TRW, Inc., 987 F.2d 288, 294 (5th Cir. 1993) (no willfulness where no evidence that plaintiff "thwarted consciously" plaintiff's rights).  But see Cushman, 115 F.3d at 226 (allowing finding of willfulness if defendant recklessly disregarded whether actions contravened plaintiff's rights).

The statute's use of the word "willfully" imports the requirement that the defendant know his or her conduct is unlawful. Bryan v. United States, 524 U.S. 184, 192 (1998).  This reasoning is confirmed by the Sixth Circuit holding that "the defendants cannot be held civilly liable if they obtained the Duncans' reports 'under what is believed to be a proper purpose under the statute but which a court . . . later rule[s] to be impermissible legally under § 1681b.'"  Duncan, 149 F.3d at 429 (quoting Kennedy v. Border City Sav. & Loan Ass'n, 747 F.2d 367, 370 (6th Cir. 1984) (Wellford, J., concurring)).  Similarly, in Zamora the Tenth Circuit upheld a jury's finding of willfulness because the evidence showed the employees of the

17

defendant "knew the permissible purposes for obtaining consumer reports" and that the purpose for which they obtained the report was not permissible. 811 F.2d at 1371. See also Sapia v. Regency Motors of Metairie, Inc., 276 F.3d 747, 753 (5th Cir. 2002) (rejecting argument that all acts committed in violation of law are willful because a party is "imputed to know the law").

In addition to Bakker's quotation of the language from Pinner that articulates the "knowing and intentional" and "conscious disregard" standards, there is also language in Bakker that casts doubt on whether knowledge and conscious disregard of the plaintiff's rights are required to show willfulness. But on close examination of Bakker, we conclude that its holding is basically consistent with the Fifth Circuit language it quoted.

First, some of the discussion in Bakker suggests the level of culpability is recklessness, rather than knowing and intentional misconduct. Bakker discussed an earlier Eighth Circuit decision, Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829 (8th Cir. 1976), which affirmed an award of punitive damages under section 1681n, on the strength of evidence that the defendant "trampled recklessly" on the plaintiff's rights. We do not believe that this language means that recklessness is equivalent to willfulness under section 1681n. Millstone involved a violation of the Fair Credit Reporting Act's requirement that consumer reporting agencies institute reasonable procedures to assure maximum accuracy in preparing reports, 15 U.S.C. § 1681e(b). The consumer reporting agency in the case had not done so. 528 F.2d at 834. Therefore, the recklessness of the agency in Millstone in preparing the report showed a willful failure to institute procedures to avoid recklessness on the part of its employees. This is not inconsistent with the requirement of knowing and intentional misconduct.

Moreover, the facts of <u>Millstone</u> demonstrate a great deal of other intentional misconduct. The agency in <u>Millstone</u> had misled the consumer about the contents of his file and "sought at every step to block Millstone in his attempt to secure the rights given to him by the Act" to disclosure of that information. 528 F.2d at 834 (paraphrased in <u>Pinner</u>, 805 F.2d at 1263). The Fifth Circuit held that the facts showing intentional misconduct in <u>Millstone</u> distinguished it from a case in which repeated inaccuracies were not sufficient evidence of willfulness. <u>Cousin v. Trans Union Corp.</u>, 246 F.3d 359, 372, 374 (5th Cir.), <u>cert. denied</u>, 122 S. Ct. 346 (2001). <u>Cf.</u> <u>Cushman</u>, 115 F.3d at 226-27 (characterizing <u>Millstone</u> as a case involving misrepresentation and concealment and saying that willfulness must be "on the same order."). The facts of <u>Millstone</u> reflect intentional violation of the plaintiff's Fair Credit Reporting Act rights, and so it cannot stand for the proposition that recklessness would suffice to establish willfulness under the statute.

Second, <u>Bakker</u> contains some language suggesting that the defendant need not be aware that his or her conduct is unlawful to be liable under section 1681n. <u>Bakker</u> affirmed a finding of liability for willful noncompliance on the ground that the attorney-defendant in that case had requested a consumer report "without regard to whether such conduct was fair or a clear violation of Rule 4.4 of the Arkansas Rules of Professional Conduct." 152 F.3d at 1013. We did not say whether she acted without regard to whether her conduct was unlawful, rather than simply unfair or unethical. However, we had just quoted language from <u>Millstone</u> that referred to the defendant trampling the plaintiff's rights under the Fair Credit Reporting Act. <u>Id.</u> Therefore, our failure to mention the need for awareness of the plaintiff's statutory rights again in the next sentence cannot be interpreted to be an intentional omission of that element. Moreover, <u>Bakker</u> pointed to evidence that the attorney-defendant had been informed that the reports she requested were subject to regulation under the Fair Credit Reporting Act:

19

> [A]ppellant's contract with the Credit Bureau of Fayetteville/Springdale indicated that the reports were subject to the Act and that she agreed that she would only request the information when she intended to use the information in relation to consumer purposes identical to those set out in the Act, i.e., eligibility for personal credit or insurance, employment purposes and licensing or a business transaction involving the consumer.

Id. at 1012.

There is yet another aspect of Bakker that could be interpreted as finding willfulness without awareness that the acts violated the law. The defendant in Bakker contended that she had a legitimate business purpose for requesting the report, namely preparation for litigation, and that this was a permissible use under section 1681b(3)(E) (1994), so that her request did not violate the Fair Credit Reporting Act. We rejected her legal argument that litigation preparation was a permissible purpose and affirmed the entry of judgment against her. However, we did not consider the factual question of whether the evidence would have supported a finding that she believed she was behaving lawfully. The Sixth Circuit had just held that such a belief would negate willful noncompliance: "[T]he defendants cannot be held civilly liable if they obtained the Duncans' reports 'under what is believed to be a proper purpose under the statute but which a court . . . later rule[s] to be impermissible legally under § 1681b." Duncan v. Handmaker, 149 F.3d 424, 429 (6th Cir. 1998) (quoting Kennedy v. Border City Savings & Loan Ass'n, 747 F.2d 367, 370 (6th Cir. 1984) (Wellford, J., concurring). We cited Duncan with approval in Bakker, 152 F.3d at 1011, 1012. Had we intended to issue a holding directly at odds with it, we would likely have done so explicitly.

We conclude that our Circuit precedent is consistent with the rules that willful noncompliance under section 1681n requires knowing and intentional commission of an act the defendant knows to violate the law.

Here, there is evidence that none of the three defendants believed their conduct to be covered by the Fair Credit Reporting Act. William Porter of Econ Control testified that a representative of Computer Science Corporation told him that a Finder's Report was not a "credit report." Kevin Fitzgerald of McDowell Agency knew of Econ Control from the Minnesota Private Investigators Association meeting, where Porter had told the attendees that they could obtain Finder's Reports without the authorization of the subject. Fitzgerald testified, "To the best of my knowledge, a finder's report is not considered a credit history." He also testified: "I did not do anything that I know to be illegal, unethical, or outside the standard practice of private investigators." Mary Grendahl testified that she only asked Fitzgerald to look into Phillips's background and that she gave him no instructions on how to do the investigation. She stated: "At no time did I ask Mr. Fitzgerald to try to obtain credit information or a 'credit report,' and it is my understanding that he did not do so."

On the other hand, there is also evidence that each defendant had some experience in dealing with credit reports and either knew of the Fair Credit Reporting Act or at least knew that such reports can only be obtained legally under certain circumstances. This kind of experience can support an inference that the defendants knew that their actions were impermissible. Cf. Duncan, 149 F.3d at 429 (noting that defendants were lawyers, which contributed to create an issue of fact as to their knowledge that their request was illegal). There is also the telephone message that could be interpreted to mean that Mary Grendahl directed Fitzgerald to obtain a credit report. Additionally, someone wrote on the Phillips Finder's Report: "Credit Inquiry Report & Employment Trace." These facts are sufficient to create a genuine issue of material fact as to whether defendants acted knowingly and with conscious disregard for Phillips's legal rights.

21

(2)

Section 1681n(a)(1)(B) provides for statutory damages for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, only in actions against natural persons. Our discussion of this section is therefore limited to the claim against Mary Grendahl. This section requires either false pretenses or knowing acquisition of a consumer report without a permissible purpose. Since either is sufficient, Phillips's evidence raising a fact issue as to whether Mary Grendahl knowingly obtained a consumer report on him with conscious disregard for his legal rights is also sufficient to make a submissible case under this section. We therefore need not reach the question of whether the statute's use of the term "false pretenses" requires intent to mislead.

(3)

Section 1681o provides a private cause of action for negligent failure to comply with the Fair Credit Reporting Act. Since Phillips has raised factual issues sufficient to require trial on whether defendants willfully violated his rights under the Act, it follows that he has also made a submissible case as to negligent violation of those same rights.

IV.

Finally, Phillips contends that the acquisition of his credit report by the defendants tortiously invaded his privacy. More specifically, he contends that the defendants invaded his seclusion and published "private information which was highly offensive to Plaintiff" and the information published was "not of legitimate concern to the public."

22

Minnesota has recognized the tort of invasion of privacy generally and the two varieties of invasion of privacy alleged here, intrusion upon seclusion and publication of private facts. Lake v. Wal-Mart Stores, Inc., 582 N.W.2d. 231, 235 (Minn. 1998).

The tort of publication of private facts consists of giving "publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Id. at 233 (quoting Restatement (Second) of Torts § 652D). The commentary to the Restatement section describing this tort states:

> "Publicity". . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. . . . Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

Restatement (Second) of Torts § 652D, comment a. In light of Lake's definition of the tort by reference to the Restatement (Second), it is reasonable to expect that the Minnesota Supreme Court would adopt this definition of a key term in the newly recognized tort. See C.L.D. v. Wal-Mart Stores, Inc., 79 F. Supp.2d 1080, 1083-85 (D. Minn. 1999). However, the Minnesota Court of Appeals recently referred to the definition of publicity from the Restatement comment, relied on by the District of Minnesota in C.L.D., as "a high threshold" and stated that "the C.L.D. case does not limit the reach of the Lake decision nor does C.L.D. constrain this court from reaching an appropriate disposition in this or other cases." Bodah v. Lakeville Motor Express, Inc., 649 N.W.2d 859, 865 (Minn. Ct. App. 2002). Yet, even the Minnesota Court of Appeals recognized that "disclosure to a single person or a handful of people," is not generally enough to constitute publicity, and the court there remanded for trial on whether the information at issue had been distributed to more than the

23

sixteen intended recipients of the information. Id. at 865-66. Phillips has failed to create a genuine issue of fact as to whether the report was given this sort of publicity. There is no evidence that Econ Control gave it to anyone but McDowell or that McDowell gave it to anyone but Mary Grendahl. Mary Grendahl testified that she never shared the Finder's Report with anyone. Phillips's allegations about his telephone conversation with Laura Grendahl do not tend to show that Laura had access to the Finder's Report because Laura only mentioned facts that were available from public records and which were not included in the Finder's Report. Phillips's publication of private facts claim fails.

The tort of intrusion upon seclusion has three elements: an intrusion; that is highly offensive to a reasonable person; into some matter into which a person has a legitimate expectation of privacy. Swarthout v. Mut. Serv. Life Ins. Co., 632 N.W.2d 741, 744 (Minn. Ct. App. 2001). Therefore, we must determine whether the Finder's Report contains any information as to which Phillips had a legitimate expectation of privacy and discovery of which a reasonable person would find highly offensive.

Of the information that might be private, none was of a nature that would render its discovery highly offensive to a reasonable person. Although we have determined the Finder's Report was technically a consumer report, it was quite skeletal. The only information pertaining to credit was the existence of the four "trade lines" and the existence of one trade inquiry, with no adverse or positive information about these entries. In contrast, Phillips himself gratuitously appended a full-scale credit report on himself to his complaint, filed as a public document, replete with information about charged-off credit cards and a delinquent child support

24

obligation.[9] Discovery of the trade lines and trade inquiry does not rise to the level of being highly offensive.

The Finder's Report did contain Phillips's social security number. While the Minnesota Court of Appeals recently held that social security numbers were private information for the purpose of the publication of private information tort, Bodah, 649 N.W.2d at 863, at the same time that court stated:

> Although social security numbers are private, they are available in a wide range of contexts in our society. We provide them to others continuously.

Id. at 863. Discovery of that number therefore does not fit the profile of intrusion upon seclusion. Moreover, Fitzgerald obtained Phillips's social security number from a computer databank before he ever requested the Finder's Report.

The most sensitive information in the Finder's Report was the existence of a child support order, but Phillips had no reasonable expectation of privacy in the existence of that order. Phillips himself admitted that the existence of a child support order, which is all the Finder's Report shows, is "public information," and Grendahl was well aware that Phillips had children from previous relationships before she ever asked McDowell to investigate Phillips. Sarah Grendahl babysat for one of these children. The use of improper methods to obtain information, such as a request that violates the Fair Credit Reporting Act, does not necessarily make the acquisition of

---

[9]The credit report was attached to the complaint and described as a "true and correct copy of Plaintiff's May 19, 2000 credit report," thus creating the misimpression that this, or an earlier version of the same thing, was the document the defendants obtained. The district court withheld judgment on whether Phillips's appending the full credit report to his complaint was "evidence of chicanery." Phillips v. Grendahl, No. CIV 00-1382, 2001 WL 110370 (D. Minn. Sept. 19, 2001).

information highly offensive, if the information could just as well have been obtained by proper means. <u>Swarthout</u>, 632 N.W.2d at 745; <u>see generally</u> Restatement (Second) of Torts, § 652B, comment b (no liability for examination of public record concerning plaintiff). Therefore, uncovering the mere existence of a child support order cannot support this cause of action.

The district court did not err in entering summary judgment for the defendants on this claim.

We reverse the entry of summary judgment on Phillips's Fair Credit Reporting Act claim and affirm the entry of judgment on the Invasion of Privacy claim. We remand for further proceedings in accordance with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.